UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

PETRA OLIVER,                        )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )        1:05-cv-358-JDT-TAB
                                     )
JO ANNE B. BARNHART, Commissioner    )
of Social Security,                  )
                                     )
            Defendant.               )
                                     )

**ENTRY REVIEWING COMMISSIONER'S DECISION**[1]

Petra Oliver, who applied for supplemental security income ("SSI") on behalf of

her minor daughter ("KLO"), appeals the final decision of the Social Security

Commissioner denying her benefits under the Social Security Act.  The court set oral

argument for September 14, 2006.  However, after reviewing the parties' briefs and the

record on file from the Social Security Administration (the "SSA"), the court determined

it could reach a decision without the need of oral argument.  The court finds as follows.

**I.  BACKGROUND**

KLO, who was born December 22, 1993, was six years old when her mother

applied for benefits on her behalf on January 21, 2000.  (R. 478.)  Originally from

Columbus, Ohio (R. 257), her family has a history of instability.  She is the middle of

_____

[1]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

three sibling girls.  (R. 150.)  Her mother reports a history of physical and sexual abuse, depression, and other problems; her father a history of alcohol and drug use, depression, and other problems.  (R. 150.)  Both parents have been unemployed at least part of the time.  ( R. 301.)

The family lived in Illinois before moving to the Indianapolis area in April 1999. (R. 316, 340.)  Since then, the family has lived in an apartment and at a shelter during at least one period.  (R. 317, 340.)  Her parents separated about January 2000.  (R. 150.)  In March 2001, KLO's household comprised her mother, her sisters, her mother's boyfriend and KLO's father, who had moved back with the family because he had no place to go.  (*Id.*)

According to a questionnaire her mother completed later that year, KLO was a difficult child.  She would wake up screaming and throwing fits.  (R. 166.)  She would fight and strike her sisters.  (R. 166-67.)  She had few friends.  (R. 166.)  She would miss school.  (R. 167.)  Her parents could not control her eating.  (*Id.*)  According to a Social Security Disability evaluation form, completed in April of 2001, KLO has two impairments: a seizure disorder, diagnosed at age 3, and attention deficit hyperactivity disorder ("ADHD"), diagnosed when she was three or four years old.  (R. 236; *see also* R. 149.)

Doctors have also diagnosed sleep apnea, depression, post-traumatic stress disorder, and oppositional defiant disorder.  (R. 16.)  They have assessed her intellectual functioning between low average and below average (R. 258, 320), but also

as relatively normal.[2]  (R. 312.)  At times, KLO's behavior has been reported by her parents to be aggressive, cruel, and violent.  (R. 16.)  One of the most bizarre incidents occurred when she was four years old.  Her mother informed doctors at that time that KLO had killed a cat and a hamster and continued to play with them after the animals were dead.  (R. 464.)

KLO has possible brain damage due to repeated head-banging.  (R. 144.)  Her mother reported that an older sister had molested her in 2000.  (R. 144, 149.)  Later that year, in December 2000, KLO was hospitalized for two weeks at Community Hospital North after she attacked her younger sister by pulling her hair and throwing her to the ground.  (R. 51, 149.)  She had also threatened twice to jump out of a window to kill herself.  (*Id.*)  In early 2001, she was referred to BehaviorCorp for a medication review because she was failing in school.  (R. 149.)  She was hospitalized again for ten days in 2002 at Valle Vista in Greenwood because she was reported to be "out-of-control, and a danger to self and others."  (R. 62.)

## A.  Medical Records History

KLO has a medical history in keeping with a child from a family that has been fairly transient and dependent on public benefits.   Medical care has been provided primarily through clinics; her association with any particular treating physician has

---

[2]  A psychologist reviewing KLO's file based this assessment on a drawing KLO provided during a consulting exam, in which the psychologists concluded KLO is functioning intellectually in the low average range – not mentally retarded but with limitations.  (*See* R. 320, 322.)

generally been of limited duration.  The institutions delivering care, the time periods involved, and the relevant medical history are summarized as follows:

**Carterville Family Practice Center**, Carterville, Illinois.  (R. 427-51, 453-65). KLO received medical care here, and associated institutions such as Herrin Hospital of Herrin, Illinois, from at least November 8, 1996, through at least September 24, 1998. Attending medical staff began observing hyperactivity at least as far back as June 6, 1997, when KLO was three years old.  (R. 447, 458, 461.)

In a questionnaire, apparently completed in May 1998 to assess ADHD and related symptoms, KLO's pre-school teachers, Karen Uban and Mary Jane Estrada, both reported that KLO was highly restless, inattentive, impulsive, distractable, and a disturbance to other children.  (R. 446-47.)  KLO's mother noted on her portion of the questionnaire that KLO had "shoved down" her younger baby sister.  (R. 445.)  At least by June 1998, doctors began prescribing Ritalin and other ADHD-appropriate medication.  (*See* R.  461.)  Her mother told one of the treating doctors about the incident involving the dead cat and hamster.  (R. 464.)

**St. Mary's Good Samaritan,** Centralia and Carbondale, Illinois.  (R. 383-91.) Records indicate she was treated here at least from October 29, 1998, through January 7, 1999.  (*Id*.)  A Carterville Family Health Center physician referred KLO to this agency,

apparently for treatment of depression, bizarre behavior,[3] mood swings, throwing herself on the ground, and aggression.  (R. 391.)

**Midtown Mental Health Center**, Indianapolis, Indiana.  (R. 331-60).  Records indicate KLO received therapy here from May 25, 1999, at least through January 27, 2000.  (*Id.*)  A Biopsychosocial Assessment, completed over the course of 10 days, listed ADHD as her primary clinical problem under the DSM-IV diagnostic scheme, the parent-child relationship as a related long-term problem, seizure disorder as a relevant medical condition affecting the first two problems, and a chaotic home life as a social or environmental issue.  (R. 344.)  The clinician completing the summary described KLO as "a seriously emotional[ly] disturbed 6 yr-old Caucasian female who has a [history] of ADHD, aggression and seizure disorder.  Her family has a history of dysfunction and has moved from state to state and has a [history] of homelessness."  (R. 343.)[4]

**Wishard Memorial Hospital**, Indianapolis, Indiana.  (R. 56-61, 244-54, 267-85. 363-80, 417-22).  KLO was treated for a variety of problems, mostly involving general health issues, from July 19, 1999, at least through February 19, 2002.  (*Id.*)  She was seen most often by Dr. Joanne Smith, who noted Mrs. Oliver's concerns about seizures (R. 248), referred her to the neurology department for further evaluation of her seizures

---

[3] According to progress notes, KLO mutilated the cat and hamster, and played with their entrails.  (R. 391.)

[4] KLO's parents appeared unwilling or unable at times to become involved in planned therapy.  (R. 359.)  On January 26, 2000, a social worker noted that a Children's Bureau worker was working to transfer the family's case to Adult and Child Mental Health Center.  (R. 359-60.) "Family only came in for meds.  Therapy sessions were inconsistent & family states too hard to come for therapy."  (R. 360.)

and medications (R. 250), and arranged for KLO to undergo an apnea study (R. 247, 421).[5]  An electroencephalography ("EEG") performed August 9, 1999, revealed epileptic type activity "which places the patient at risk for focal and secondarily generalized seizures."  (R. 283.)

**Riley Hospital for Children/Indiana University Medical Center**, Indianapolis, Indiana.  (R. 394-414.)  Tests were performed at Riley or IU in September and October 1999.  An additional video-monitored EEG recorded no seizures.[6]  (R. 394.)  A sleep study, conducted September 28, 1999, revealed mild apnea, possibly resulting from enlarged tonsils for which surgery was recommended.  (R. 395.)  A magnetic resonance imaging ("MRI"), apparently conducted to rule out the possibility of tumor, was normal. (R. 402.)

**Adult and Child Mental Health Center**, Indianapolis, Indiana.  (R. 301-10.) KLO's school case manager referred KLO here for psychiatric evaluation in March 2000.  (R. 301.)  The evaluating psychiatrist, Dr. Charles Coats, reported a "diagnostic impression" of ADHD and "[u]nspecified developmental delays" as her primary problem.

---

[5]  According to a hospital record for June 19, 2000, KLO's mother found her a couple of times lying on the floor and drooling. (R. 248.)  She also reported that KLO was having hallucinations and staring spells.  (*Id.*)  The administrative law judge later discounted these reports as probable exaggerations (R. 19-20), but found relevant the notation on the same record that KLO could tie her shoelaces.  (R. 21.)  Although the record does not indicate the source of this latter information, the notation was merely one of a series of checks regarding developmental skills, for which Mrs. Oliver or KLO herself was the likely source.  In either case, the reliability of the information could be subject to similar concerns.

[6]  This EEG, conducted from 11:15 a.m. October 4, 1999, until 8:45 a.m. October 5, 1999, failed to record for two minutes, when Ms. Oliver reported that her daughter was screaming.  The physician overseeing the test attributed the screaming to a "night terror," based on the data recorded immediately afterward.  (R. 394.)

(R. 302.)  Coats prescribed a continued regime of medication and said that KLO should continue to be seen by the IPS case manager and return for a followup visit in eight weeks.[7]  (*Id.*)

**Community Hospital North**, Indianapolis, Indiana.  KLO was hospitalized here for behavioral problems in December 2000.  (*See* R. 51, 149, 160.)  SSA did not obtain any records from this stay.

**BehaviorCorps**, Indianapolis, Indiana. (R. 64-148, 152-53.)  This mental health agency provided treatment from February 9, 2001, at least through July 10, 2002.  (*Id.*)  She was referred[8] to the agency because she was failing in school (grades of D's and F's), fighting constantly, lying, and destroying property, among other problems.  (R. 149.)  The initial assessment provided a diagnosis of ADHD and post traumatic stress disorder.  (R. 151.)  Progress notes of therapy sessions with KLO and family members showed improvement to the point that KLO was reported on May 23, 2002, to be "doing well academically & emotionally."[9]  (R. 69; *see generally* R. 69-87.)

**Valle Vista Health System**, Greenwood, Indiana.  (R. 62-63.)  KLO was hospitalized here from May 24, 2002 through June 3, 2002, for behavioral problems.

---

[7]  The psychiatrist based his decision to continue KLO's medications at the same level on reports by KLO's father and her case manager that she was "doing well with regards to control of her ADHD sypmtoms."  (R. 301-02.)

[8]  The records do not indicate who referred KLO.

[9]  One therapist questioned Mrs. Oliver's credibility after KLO reported that an episode in which her mother said she was "out of control," occurred while "they were trying to whip her." (R. 80.)

(*Id.*)  She was reported to be "passively suicidal and homicidal.  (R. 62.)  At admission

her judgment was intact but "showed limited impulse control."  (*Id.*)  The center's

diagnosis on discharge was that KLO suffered a severe episode of depression.  (R. 62.)

The center also diagnosed oppositional defiant disorder, ADHD, and obsessive-

compulsive disorder.  (*Id.*)

### B.  Additional Medical Evidence

SSA obtained three consulting exams.

**Dr. Jerome Modlik**, a clinical psychologist, examined KLO on April 12, 2000.

(R. 316-322.)  He diagnosed her as having ADHD.[10]  (R. 321.)  He also noted that she

appeared to have limitations on her intellectual functioning and recommended further

testing.  (R. 320.)  Regarding the severity of her ADHD, he said KLO was not "grossly

distractable," but he believed "she would have great difficulty functioning in a

classroom."  (*Id.*)  He questioned whether she had a seizure disorder.  (*Id.*)

**Dr. Samer Ammar**, a physician, examined KLO's physical health on May 20,

2000.  (R. 297-99.)  He reported no immediate physical problems.  (R. 299.)  He listed

his "impression" of a 6-year-old girl with "absence seizures," also known as *petit mal*

seizures, and a history of attention deficit disorder.  (*Id.*)

---

[10]  Dr. Modlik recalled examining KLO's mother for disability on June 23, 1999, and
noting a "grossly chaotic and disorganized" family.  (R. 318.)  One child, whom he suspected to
be KLO, threw a "horrendous temper tantrum in which the father had to literally pick up the child
and take her outside into the hallway and restrain her on the floor."  (*Id.*)

**Dr. Alfred R. Barrow**, a psychologist, examined KLO on December 6, 2000.  (R. 256-261.)  He also diagnosed her as having ADHD and possible "borderline intellectual functioning" although her judgment and capacity for abstraction appeared age appropriate.  (R. 260-61.)  In describing KLO's appearance during the interview, Dr. Barrow noted that KLO was initially restless but became calmer as the setting became more structured.  (R. 258.)  His report concluded that KLO "meets the criteria for a combined type of hyperactivity given evidence of impulsivity and hyperactivity, some distractability."  (R. 260-61.)  He concluded that her placement in a regular educational class showed that medications were controlling her hyperactivity.  (R. 260.)

KLO's records also were reviewed on two occasions, each time by a physician and a psychologist, to determine her eligibility for disability.  The first evaluation, in May and August 2000, following the Modlik examination, found that KLO had a marked limitation in the domain of concentration, persistence or pace, but no limitation in the cognitive and personal attainment domains and less than marked limitations in the motor and social domains.  (R. 295.)  An explanatory note described KLO as having an average IQ and ADHD, and suggested her mother was exaggerating her symptoms.  (R. 296.)  No explanation for this comment was provided.

A second evaluation was completed in April 2000.  Here the doctors found no limitation in the domains of acquiring and using information, moving and manipulating objects and caring for oneself, and less than marked limitations in health and physical well-being, attending and completing tasks, and interacting and relating with others.  (R. 238, 241.)  The doctors noted that while KLO had a history of ADHD, her classroom

assignments generally last 30 to 40 minutes and that, according to Dr. Barrow's report, she was somewhat restless and distracted but responded to structure.  (R. 238.)

Lastly, at KLO's hearing, which was conducted February 18, 2003, KLO, her mother, and two expert witnesses, who had reviewed KLO's medical files, testified.  (R. 27.)

**Dr. Paul Boyce**, a physician specializing in internal medicine, testified that KLO's seizures, sleep apnea and weight problems, even in combination, would not be the equivalent of a listed impairment.  (R. 41)

**Dr. Georgia Ann Pitcher**, a clinical psychologist, testified that all of KLO's mental impairments, even in combination, interfered "very little" with her functioning, even when the impairments were considered in combination.  (R. 46.)  She noted that KLO often did well at school (R. 53), although irregular school attendance caused problems (R. 44-45), that some therapy was aimed at improving parenting skills (R. 43, 46), and that KLO's functional limitations were not marked except during her periods of hospitalization (R. 54).

## II.  STANDARD OF REVIEW

A child under age eighteen is entitled to disability benefits if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 1382c(a)(3)(C)(i).  This standard was established in 1996 and requires "more serious impairment related limitations" than was required previously.  *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1995).

Social Security regulations set forth a three-step test to determine claims under this standard.  20 C.F.R. § 416.924(b)-(d).  This test requires the Commissioner to determine whether (1) the child is engaged in substantial gainful activity, which would preclude a finding of disability, (2) has a medically determinable impairment or impairments that are severe, and if so, (3) whether the impairment "meets, medically equals, or functionally equals a listed impairment."[11]  *Id.*

---

[11]  Nearly all appeals of child disability decisions begin, as this case does, at the third step, which involves three separate considerations – whether the impairment meets, medically equals, or functionally equals a listed impairment.  The listed impairments are grouped into categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The SSA has issued regulations for each of the three ways of satisfying the third step of the child benefit test:

1.  An applicant's impairment meets a listing if it satisfies the listing's A requirements, which specify the medical criteria, and the B requirements, which specify the functional limitations that must result from the impairment.  20 C.F.R. § 416.925.

2.  An applicant establishes medical equivalence by having (1) a listed impairment that does not exhibit all of the required findings or severity and showing other findings related to the impairment that are "at least of equal medical significance," (2) an impairment that is not listed but is closely analogous and would otherwise satisfy the requirements, or (3) a combination of impairments with findings "at least of equal medical significance" to a closely analogous listing.  20 C.F.R. § 416.926.

3.  An impairment is functionally equivalent if the applicant can show an "extreme" limitation in one area of functioning known as a domain, or two "marked" limitations in a domain.  20 C.F.R. § 416.926a.  There are six domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for oneself, and health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  A marked limitation interferes seriously with the applicant's ability to initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  An extreme limitation interferes very seriously.  20 C.F.R. § 416.926a(e)(3)(i).

A district court reviews, on appeal, the final decision of the Social Security Commissioner, which will be the findings of the Appeals Council if it has reviewed the case or the findings of the Administrative Law Judge (the "ALJ") if the council has denied review.  *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993).  This review is a deferential, two-part inquiry to determine whether the council or ALJ's decision is based on the proper legal standards and is supported by substantial evidence.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004)).  "Substantial evidence" is "such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (quoting *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000)).  Although the court, in making this inquiry, reviews the entire administrative record, the court does not reweigh the evidence, determine facts, or substitute its judgment for the council's or ALJ's.  *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Nelson,* 131 F.3d at 1234.  The council's or ALJ's credibility decisions are entitled to special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

While the review is deferential, the court will not uphold the decision if there is insufficient evidence or the findings "do not build an accurate and logical bridge between the evidence and the result."  *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).  The council or ALJ must, at least minimally, discuss and articulate the reasons

for rejecting significant evidence supporting the applicant's claim of disability.  *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992).

### III.  DISCUSSION

This case is an example of a voluminous, yet often uninformative, record. Evidence exists within the record that to some extent supports a denial of benefits, and the ALJ has cited it, directly or indirectly.  The record, however, also contains substantial evidence that could support a grant of disability, and the ALJ has failed to address its significance.

#### A.  Plaintiff's Arguments

KLO argues that the Commissioner's decision should be reversed and benefits awarded because: (1) the ALJ relied unlawfully on non-medical evidence; (2) the decision failed to address the domains applicable to functional equivalence of a childhood listing; (3) the ALJ failed to demonstrate that his decision was based on a preponderance of evidence; (4) the decision fails to consider the effect of KLO's impairments in combination; (5) the ALJ was inconsistent, misconstrued the evidence, and made impermissible judgment and (6) the ALJ failed to order updated records necessary to developing a full and fair record.  (Pl.'s Br. 3, 5-12.)

The first argument fails on its face.  KLO states that the ALJ's denial is based on the non-medical testimony of KLO's parents.  (Pl.'s Br. 5.)  This cannot be true because

13

the ALJ discounted much of the parents' testimony.  (R. 19.)  Specifically, he concluded, "[S]ubstantial evidence in the record supports the inference that they are embellishing the claimant's behavior."  (*Id.*)  So, KLO is asserting something else.  She is arguing that the ALJ's disapproval of the parents' lifestyle and parenting skills unfairly colored his decision, and that if he had set aside his preoccupation with the parents' credibility, the medical evidence would have led him to find KLO to be disabled.  "[I]t is wrong to punish the child for the instability of the family life," she states.  (Pl.'s Br. 6.)

The medical evidence, however, does not support an automatic finding of disability, absent any consideration regarding KLO's parents.  Some medical evidence favors a finding that KLO is seriously impaired while other evidence suggests that her impairments are manageable.  A mental health clinician evaluating KLO in January of 2000 described her "as a seriously emotional[ly] disturbed" girl.  (R. 343.)  Two months later, however, her primary care physician observed "less violent behavior."  (R. 328.)  Her psychiatrist reported that she was doing well "on her psychopharmacological treatment regime."  (R. 302.)  KLO was hospitalized for behavioral problems in December 2000 (R. 149, 160), and again in late May 2002 (R. 62-63.)  Yet, in between, progress notes from BehaviorCorps, which was providing psychological therapy, indicate that KLO was doing well academically and emotionally.  (R. 69-87.)  Such inconsistency does not justify a conclusion that, but for the ALJ's views toward KLO's parents, he would have rendered a decision in her favor.

KLO's last argument, that the ALJ failed to develop a full and fair record, can be dismissed summarily, also.  KLO alleges that the ALJ discovered at the hearing that a substantial number of BehaviorCorps records were kept at KLO's school and had not been produced for the hearing.  (Pl.'s Br. 12.)  She argues that the hearing should have been continued to give her an opportunity to obtain these records.  (*Id.*)  Instead, "the ALJ took testimony from experts who did not have a complete record and analyzed statements from teachers without a full record to properly ascertain the weight their statements should be given."  (*Id.*)

Although the burden of showing that a disability exists rests upon the applicant, KLO is correct that the ALJ has a duty to develop a full and fair record, and a failure to do so is "good cause to remand for gathering of additional evidence."  *Thompson v. Sullivan*, 933 F.2d 581, 585-86 (7th Cir. 1991).  This duty is greater when the applicant is not represented by counsel, *id.*, but the basic obligation exists in all cases.  *See* 20 C.F.R. § 404.1512(d).  It is limited generally to developing a complete medical record for the twelve-month period prior to the filing of an application or an earlier relevant period. (*Id.*)  Moreover, the mere omission of facts not prejudicial to the outcome is insufficient to warrant remand.  *Nelson*, 131 F.3d at 1235.

KLO's argument is disingenuous for several reasons.  First, the only indication that substantial records from BehaviorCorps are missing from the record comes from a

15

line of questions at the hearing.  (R. 50.)  These questions, and the answers of medical

expert Dr. Pitcher, only establish a *possibility* that some records might not have been

produced.  (*Id.*)[12]  Second, there is no record of KLO or her counsel requesting an

opportunity to obtain additional records.  Third, KLO has offered no evidence or reason

to believe that the records, if they exist, would provide any information different from the

BehaviorCorps progress notes already in the record.  In this sketchy context, regarding

a possibility of records that might or might not have any probative value and well past

the twelve-month window, the ALJ did not breach any duty to develop a full and fair

record, at least with regard to the BehaviorCorps records.[13]

---

[12]  The exchange, in its entirety, reads:
> Q  Well, also, apparently the Behavior Corps records of treatment [by] this Pam Thulan for this year – apparently the records are kept at the school rather than at Behavior Corps is what it sounds like.
> A  It did to me to.  In this case management, it all sounds like it took place at school.
> Q  Right.
> A  Case manager –
> Q  So it might have been helpful to – we've got this one letter where she's kicked out for fighting, and it certainly would have helped to have the counselor's notes to put that in context.  And it doesn't look like we have that.
> A  No, we just go to July 10 of last summer. And then the last – that last statement [by the counselor that] she had not been in contact with mother, didn't know why she'd gone to Valley Vista, and didn't get her calls returned.  That's the last I have.

(R. 50.)

[13]  KLO also criticizes the judge for not questioning her, her mother, or Dr. Pitcher more closely during this hearing about the impact of her impairments.  (Pl.'s Br. 8.)  However, even in a child disability case, the initial burden of proof rests on the claimant, and KLO, through her attorney, provided the ALJ with only limited guidance on the strengths of her claim.  His questions focused on her seizure disorder, behavioral issues including her hyperactivity and aggression, and the lack of evidence regarding her two hospital stays.  He paid only a little attention to the medical, therapy, and school records regarding KLO's ADHD.

Not surprisingly, the ALJ devoted substantial discussion in his decision to the issues that KLO advanced most strongly at her hearing – her seizure disorder and her behavior problems.  (*See* R. 31-35.)  The ALJ noted discrepancies in the descriptions by KLO's parents of the

(continued...)

16

**B.   The ALJ's Alleged Failure to Address Significant Evidence**

KLO also alleges that the ALJ failed to address adequately her functional limitations and the combined effect of her impairments, and that the ALJ selected statements merely to prove his points and improperly speculated about evidence.  (Pl.'s Br. 8-9, 11.)  These arguments turn on the contention that the ALJ failed to consider and discuss significant evidence indicating that KLO's functioning was markedly or severely impaired in one or more areas.

If KLO has any constant diagnosis, it is ADHD.  Doctors observed signs of hyperactivity when she was three and her mother was bringing her to the clinic for routine medical care.  ( R. 458.)  ADHD has been the consistent assessment of nearly every health care professional who has examined her.  (*See* R. 63, 151, 302, 344,[14] 462.)  Not all diagnoses are dependent on the reports of her parents, although the record contains little information about the diagnostic methods used.  A questionnaire was given to KLO's mother and two Illinois pre-school teachers in May 1998 apparently to help determine the extent of KLO's ADHD.  (R. 445-47.)  A mental health team at Midtown Mental Health Center also completed what was labeled as a clinical assessment in early January 2000.  (R. 343-45.)  Additionally, both of SSA's consulting

---

[13](...continued)
intensity, effects, and duration of KLO's seizures.  (R. 20.)  However, he also noted that the discrepancies were inconsequential.  (*Id.*)  He cited substantial evidence in the record that KLO's seizures are relatively minor in duration and controllable with medication.  (*See* R. 20-21.)

[14]  The DSM-IV diagnosis of 314.01 is ADHD, combined type, showing symptoms of both inattention and hyperactivity/impulsivity.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 93 (4th ed. Text Revision 2000).

psychologists, Dr. Jerome Modlik, and Dr. Alfred R. Barrow, examined KLO to some degree and concluded that she has ADHD.  (R. 321, 260-61.)

Seizure disorder is the only other diagnosis recurring nearly as frequently, although the evidence regarding the extent of this impairment is ambiguous.  An electroencephalograph ("EEG") in August 1999 revealed epileptic type activity, leading the physician to conclude that KLO was "at risk" for seizures.  (R. 283.)  A subsequent EEG, performed overnight and videotaped, failed to record any seizures.  (R. 394.)  However, KLO's doctors relied on the August 1999 EEG and continued to prescribe anti-seizure medications such as Depakote and Tegretol for KLO.  (*See, e.g.*, R. 348, 417, 420.)  Teachers and KLO's parents have reported staring spells and other behavior consistent with such seizures.  (*See, e.g.*, R. 160, 301.)

Ultimately, whether KLO's claim of disability was analyzed on a "meets," "medically equals," or "functionally equals" basis, the issue confronting the ALJ was the severity of her impairment.  The ALJ's decision reflects this.  To demonstrate that her impairments meet a listing, KLO would have to show a marked impairment in two of these four areas: cognitive/communicative functioning, social functioning, personal functioning, and maintaining concentration, persistence, or pace.  *See* 20 C.F.R. § 416.925.  The ALJ discusses each and cites medical opinions in each area that support his conclusion that KLO is not markedly impaired.  (R. 18-19.)  To demonstrate that her impairment functionally equals a listing, KLO would have to show a severe limitation in

one domain of functioning or marked impairment in two domains.  20 C.F.R. § 416.926a.  The ALJ discusses each briefly, citing one or more records, to support his findings of no to moderate limitations in each of the six domains.

The issue before the court is not whether the ALJ addressed each area or domain of functioning, but the adequacy of his analysis.  In this respect, the court's role is limited.  KLO would have the court determine if the ALJ was requiring her to prove her disability by a higher standard than a preponderance of the evidence.  (*See* Pl.'s Br. 9.) Absent gross indications of a different standard, which the decision does not reflect, the court would have to re-evaluate the evidence – something that the Seventh Circuit has repeatedly instructed reviewing courts to avoid.   "We review the record as a whole, but we are not to reweigh the evidence or substitute our judgment for that of the ALJ." *Haynes*, 416 F.3d at 626.

In determining if the ALJ's analysis is adequate, the court's considerations are few:  Was the supporting evidence relevant?  *Id.*  Did the decision build a "logical bridge" between the evidence and conclusion?  *Id.*  Was credible clinical evidence considered?  *Nelson,* 131 F.3d at 1237.  Was significant contrary evidence discussed? *Godbey*, 238 F.3d at 808.

The ALJ discussed KLO's ADHD in three places.  First, he noted her disorder in determining that her "concentration, persistence or pace is no more than moderately

19

impaired." (R. 18.)  He based this conclusion partly on Mr. Oliver's statements that his daughter's medications are "extremely beneficial." (R. 18.)  The ALJ also noted that KLO became calm and attentive during Dr. Barrow's examination as the psychologist structured her activities, even though KLO had not taken her initial dose of medication that day. (*Id.*)  (This characterization of a written report seems to be unduly presumptuous, and is perhaps erroneous.  Dr. Barrow noted only that KLO became more calm – a relative description not necessarily indicative of calmness.  Also, the court could not locate any reference in Dr. Barrow's report indicating that KLO had not taken her medication that day.[15])

The ALJ discussed KLO's ADHD again in the course of commenting on the credibility of KLO's parents.  He offered this comment: "Granted, the claimant is restless, hyperactive and impulsive [citations omitted] and, hence, a distraction to others [citation omitted].  However, as Dr. Pitcher noted, she improves in all areas on medication [citation omitted] and in response to structure [citation omitted]." (R. 20.)

The ALJ's third reference to KLO's ADHD occurs during his discussion of her ability to interact or relate to others, the third domain in a functional equivalence analysis.  (R. 21.)  The ALJ restated his view that she is  "mildly to moderately impaired" by her ADHD symptoms." (*Id.*)

---

[15]  The ALJ may be confusing Dr. Barrow's report with that of Dr. Coats, the evaluating psychiatrist at Adult and Child Mental Health Center, who observed in his report that KLO had not taken her noon medication when he examined her.  (R. 302.)  Such an observation in any event would be relatively meaningless without knowing when the examination occurred and the medication's rate of effect and dissipation.

The record contains a fair quantity of evidence – disregarding reports dependent on the credibility of KLO's parents – that might support a finding of a marked impairment or greater.  KLO's preschool teachers found KLO be highly restless, inattentive, distractable, and a disturbance to other children.  (R. 446-47.)  One of KLO's first-grade teachers reported on February 20, 2001, that KLO "stares off into space" on a daily basis.  (R. 160.)  Although this teacher told the SSA adjudicator that KLO's grades were mostly in the C range, KLO was earning Ds and Fs when she was referred to BehaviorCorp that same month because she was failing in school.[16]  (R. 149.)  Dr. Modlik concluded from his psychological consultive exam that KLO was not "grossly distractable" but "would have great difficulty functioning in a classroom."[17]  (R. 320.)  In the second psychological consultive exam, Dr. Barrow noted that KLO "meets the criteria for a combined type of hyperactivity given evidence of impulsivity and hyperactivity, some distractability."  (R. 260-61.)  The agency's first evaluating psychologist-physician team rated KLO as having a marked limitation in concentration, persistence, or pace.  (R. 295.)

---

[16]  Testifying medical expert Georgia Ann Pitcher indicated that the BehaviorCorps therapy was provided through or at KLO's school, in which case the school may have supplied at least some of the referral information.

[17]  Dr. Modlik's report is not a model of clarity.  His assessment of KLO's classroom ability is lumped with his discussion of her intelligence and seizure disorder.  (R. 320.)  This may have led the ALJ to considered the comment only in relation to intellectual functioning, which is the paragraph's opening topic.  However, the comment is preceded by his observation of her "motoric overactivity" and followed by his diagnosis of ADHD symptoms.  (*Id.*)  Dr. Barrow, in his subsequent report, considered Dr. Modlik's comment in relation to KLO's ADHD.  (R. 257.)  Ultimately, the meaning and significance of Dr. Modlik's comment was an issue for the ALJ.

The ALJ's failure to address some of this evidence can be disregarded because it is minor or acknowledged in his supporting citations[18] or in his reference to Dr. Pitcher's hearing testimony that KLO's behavior improves when taking her medication. Dr. Pitcher had reviewed KLO's file prior to testifying, and a hearing transcript shows that she had considered the reports regarding KLO's ADHD and determined that KLO's functioning was affected only slightly, even when the impairments were considered in combination.[19]  (R. 46.)  She noted that KLO often did well at school (R. 53.)  (Indeed, one BehaviorCorps progress note states that, according to KLO's mother and grandfather, KLO was on the "honor roll."  (R. 93.)  This third-hand observation is so markedly at odds with other reports, though, that it may raise more questions than it

---

[18]  The ALJ's citations acknowledging KLO's ADHD point to Drs. Barrow's and Coats' diagnoses (R. 260, 302), and her pre-school teachers' questionnaires (R. 446-47).  The citations suggesting that her ADHD symptoms are moderated by medication or structure are clinical records noting that her behavior has improved or stabilized (R. 248, 328, 355), parental reports that KLO is doing well or better (R. 339, 352-53, 356) and Dr. Barrow's observation that KLO became more cooperative and calm during the course of his examination, "particularly when given increased levels of structure" (R. 258).  These records only indicate improvement – not a level of severity.

[19]  At the hearing, Dr. Pitcher noted Dr. Modlik's diagnosis of ADHD.  (R 43.)  She also asserted that Dr. Modlik or Dr. Barrow (the reference cannot be determined from the transcript) attributed KLO's borderline intellectual functioning to her irregular school attendance ("because she hadn't been to school").  (R. 44.)  The court is unable to locate in the record such an observation by  Dr. Modlik or Dr. Barrow.
     The court also notes, but does not address, internal inconsistencies in Dr. Pitcher's testimony.  For example, Dr. Pitcher concludes that the record consistently shows that KLO does well in school except for episodes requiring hospitalization.  (R. 53-54.)  However, earlier she comments, "The record kind of indicates that she does well and then she is disruptive. So it hasn't been addressed as whether or not that this – the control can be consistent and what is contributing to it. . . . [T]here's no question that she has organicity behind her behavior, so . . . how that interacts, it isn't clear."  (R. 43.)

answers.[20])  Dr. Pitcher also noted that KLO's functional limitations were not marked except during her periods of hospitalization.  (R. 54).

As the Seventh Circuit has stated, "While the ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."  *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).  Under some circumstances, the ALJ's acknowledgment of KLO's ADHD symptoms, his citations to clinical notes and his reference to Dr. Pitcher might be sufficient.

However, both the Seventh Circuit and SSA regulations advise ALJs to give more weight in general to examining sources than non-examining ones.  *See Haynes v. Barnhart*, 416 F.3d 621, 631 (7th Cir. 2005); 20 C.F.R. § 404.1527(d)(1).  Moreover, an ALJ "should consider and discuss all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand."  *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997).  Here Dr. Pitcher only reviewed KLO's file and attended KLO's hearing whereas Dr. Modlik is an examining source whose report is credible medical evidence and relevant.  Yet the ALJ has not addressed what appears to be one of Dr. Modlik's primary conclusions – that KLO has ADHD to a fairly serious level.

An ALJ is not required to accept a consulting exam's conclusions.  "'Medical evidence may be discounted if it is internally inconsistent or inconsistent with other

---

[20]  The progress note does not indicate whether the honor roll denoted achievement in academics, good conduct, attendance, or some other measure.

evidence' in the record." *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (quoting *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)).  Here,  evidence exists in the record that suggests KLO functions quite adequately in school when she is taking her medications regularly, attending school regularly, and therapy is being provided to her and her family.  (*See, e.g.*, R. 93, 111, 116, 119, 127, 160-61.)  The ALJ nearly says as much, but only by way of a conclusory statement unrelated to Dr. Modlik's report.[21]  (R. 17.)

An ALJ must articulate his assessment of evidence in a way that allows the court to trace the path of the ALJ's reasoning.  *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999).  Here, the ALJ has not discussed Dr. Modlik's report or the assessment by one of the agency's own reviewing teams that KLO's concentration was markedly impaired in concentration, persistence or pace.  (*See* R. 295.)  As a result, he has not drawn a bridge between the evidence and his conclusion, and this court cannot do it for him.

The ALJ also failed to demonstrate that he considered the combined effect, if any, of KLO's impairments.   Both Social Security regulations and Seventh Circuit decisions affirm an ALJ's duty to assess the aggregate effect of an applicant's impairments.  *See* 20 C.F.R. § 404.1523; *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing *Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002); *Green v.*

---

[21]  In the course of discussing KLO's intellectual functioning, the ALJ notes, "Moreover, the totality of the evidence strongly suggests that the claimant is capable of functioning at a higher level of intelligence if her home life stabilizes and, more importantly, if she attends school regularly (citations omitted)."  (R. 17.)

*Apfel*, 204 F.3d 780, 782 (7th Cir. 2000)).  Here, the ALJ determined KLO was not

markedly limited in any single area of functioning.  (R. 21.)  However, he discusses only

her seizure disorder in assessing her ability to attend to and complete tasks, only her

intellectual functioning regarding her ability to acquire and use information, and only her

ADHD and behavioral issues regarding her ability to interact and relate to others.  (*Id.*)

The ALJ's failure to consider the possible effect of KLO's impairments in

combination is compounded by the omission of any significant discussion regarding

KLO's two hospital stays for behavioral problems and other medical evidence of serious

behavioral issues.  The ALJ notes only that KLO's "concentration" improved while she

was at Valle Vista in 2002 (R. 18), and does not discuss the hospital notation that she

was a danger to herself and others, and had a Global Assessment of Functioning score

of 25, an indication of serious impairment,[22] upon admission.  He makes no reference to

her alleged two-week hospitalization in December 2000 at Community Hospital North.

(Clearly, SSA was on notice about this hospitalization, which occurred within the 12-

month window prior to KLO's claim.)  Moreover, he dismisses KLO's emotional issues

as "based primarily, if not solely" on the statements of KLO's parents despite clinical

---

[22]  A GAF score of 25 indicates that a person's behavior "is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment ... or inability to function in almost all areas."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000).

records by medical personnel presumably trained in behavioral evaluation.[23]  (*See, e.g.*, R. 343.)

KLO asserts that the ALJ "played doctor" by concluding that her behavioral problems were not the result of her impairments but the "learned behavior" of a child living in a dysfunctional family.[24]  An ALJ cannot, of course, make his or her own diagnosis or medical findings about an impairment or its effects.  *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).  Here, to the extent that the ALJ's comments were not offered to contradict a medical finding or diagnosis, his comments are merely conjectures, supported by similar observations by Drs. Pitcher and Modlik, (R. 46, 320) and medical records, regarding KLO's dysfunctional family and the need for family therapy.  (*See, e.g.*, R. 153, 345, 355.)  However, none of the medical providers have concluded that KLO's behavioral issues are "learned behavior."  The ALJ's conjectures regarding KLO's family are not evidence of KLO's ability to interact and relate to others.  Nor can his comments substitute for an analysis of the combined effects of KLO's impairments.

----

[23]  The ALJ fully supported his decision to discount the testimony of KLO's parents.  In *Brindisi ex. rel Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003), the Seventh Circuit held that an ALJ must articulate specific reasons supporting a credibility determination.  Here, the ALJ did just that, citing records revealing inconsistencies and discrepancies in the parent's statements.  (R. 19.)

[24]  KLO also asserts that the ALJ presumed that KLO's problems stemmed from a failure to take her medication properly.  (Pl.'s Br. 11.)  The ALJ's speculations are reasonable questions arising from the record.  For example, officials at Valle Vista, where KLO was hospitalized in 2002, noted that KLO "responded well" to her medications, which were continued at the pre-admission levels.  (R. 62.)

The ALJ has not discussed the significant evidence supporting KLO's claim of disability.  He has not built the accurate and logical bridge between the evidence and and his decision.

### III.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is remanded for further consideration consistent with this entry.  A separate judgment will be entered.

ALL OF WHICH IS ENTERED this 15th day of September 2006.

John Daniel Tinder, Judge
United States District Court

Copies to:

Thomas E. Kieper
United States Attorney's Office
tom.kieper@usdoj.gov

Charles D. Hankey
charleshankey@hankeylawoffice.com

27